IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ARTHUR LEE HAYES, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | No.  3:11-CV-1998-L (BF) |
| | § | |
| COMMISSIONER OF THE | § | |
| SOCIAL SECURITY ADMINISTRATION, | § | |
| Defendant. | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**
**OF THE UNITED STATES MAGISTRATE JUDGE**

This is an appeal from the decision of the Commissioner of the Social Security Administration

("Commissioner") denying the claim of Arthur Lee Hayes ("Plaintiff") for Supplemental Security

Income ("SSI") under Title XVI of the Social Security Act (the "Act"). The Court considered

Plaintiff's Brief, filed on November 23, 2011, Defendant's Brief, filed on December 14, 2011, and

Plaintiff's Reply Brief, filed on January 11, 2012. The Court reviewed the record in connection with

the pleadings. For the following reasons, the Court recommends that the District Court AFFIRM, in

part, and REVERSE, in part, the final decision of the Commissioner.

**Background**[1]

**Procedural History**

On August 13, 2007, Plaintiff filed his application for SSI alleging disability beginning

December 1, 1997 because of diabetes, back problems, and the human immunodeficiency virus

("HIV"). (Tr. 128-134, 140.) Plaintiff's application was denied initially and again upon

reconsideration, and thus Plaintiff timely requested a hearing. (Tr. 82-84.) A hearing was held on

---

[1] The following background facts are taken from the transcript of the administrative
proceedings, which is designated as "Tr."

February 19, 2009 before an administrative law judge ("ALJ"), whereby Plaintiff, represented by counsel, and a vocational expert ("VE") appeared and testified. (Tr. 27-64.) On June 30, 2009, the ALJ issued an unfavorable decision finding Plaintiff not disabled within the meaning of the Act. (Tr. 10-21.) Plaintiff requested review to the Appeals Council, but that request was denied on August 26, 2009. (Tr. 1-3.)

On October 23, 2009, Plaintiff sought review of the ALJ's decision in the United States District Court for the Northern District of Texas pursuant to 42 U.S.C. § 405(g). On September 13, 2010, the Honorable A. Joe Fish accepted the Findings, Conclusions, and Recommendation of the United States Magistrate Judge Renee Harris Toliver and reversed the Commissioner's decision and remanded the case for further administrative proceedings. (*See Hayes v. Astrue*, No. 3:09-CV-2018-G; Tr. 656-672.) The remand was premised upon the ALJ's failure to properly weigh the treating source opinions. (*See* Tr. 656-669.) Pursuant to the District Court's Orders, another administrative hearing was held before an ALJ on December 16, 2010. (Tr. 592-635.) Again, Plaintiff, represented by an attorney, and a VE appeared and testified at the hearing. (Tr. 592-635.) On April 12, 2011, the ALJ issued a decision finding that Plaintiff was disabled within the meaning of the Act as of September 27, 2009, but not prior thereto. (Tr. 565-576.)

Specifically, the ALJ found that Plaintiff had severe impairments of diabetes mellitus, asymptomatic HIV, depression, disorder of the back, obesity, and degenerative joint disease of the left knee, but did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 567-568.) The ALJ also found that Plaintiff retained the residual functional capacity ("RFC") to perform a limited range of light work and, based upon the testimony of the VE, he was capable of performing jobs

existing in significant numbers in the national economy prior to September 27, 2009. (Tr. 568-575.) The ALJ therefore found that Plaintiff was not under a disability as defined in the Act prior to September 27, 2009. (Tr. 575.) However, on September 27, 2009,[2] because Plaintiff changed to "an individual of advanced age", the ALJ found that Plaintiff met the criteria for a Medical-Vocational allowance under Rule 202.04,[3] and thus became disabled on that date. (Tr. 575.)

**Plaintiff's Age, Education, and Work Experience**

Plaintiff was born on July 27, 1954, making him over 50 years old at the time of filing for SSI benefits. (Tr. 32.) Plaintiff graduated from high school in 1973 and earned an associates degree in psychology while incarcerated. (Tr. 34.) He never used this degree in a job capacity. (Tr. 34.) At the time of the first hearing, Plaintiff was 54 years old. (Tr. 32.) By the time of the second hearing, Plaintiff was 56 years old. (Tr. 597.) Plaintiff was found to have no transferable skills and no past relevant work. (Tr. 574.)

---

[2] It appears that some of the medical records inaccurately reflect Plaintiff's date of birth as September 27, 1954, and thus, the ALJ mistakenly took that date as Plaintiff's date of birth. However, Plaintiff testified at the hearing, and a majority of the medical records demonstrate that Plaintiff's actual date of birth is July 27, 1954 instead of September 27, 1954. (*See* Tr. 218, 418, 596.)

[3] Under the Medical-Vocational Rule 202.04, a person of advanced age who cannot perform skilled work and has unskilled or no previous work experience is automatically considered disabled if their RFC is limited to light work. 20 C.F.R. Part 404, Subpart P, Appendix 2, Rule 202.04.

**Plaintiff's Relevant Medical Evidence[4]**

While incarcerated in the Texas Department of Criminal Justice ("TDCJ"), Plaintiff reported that he injured his back in 1987 when a heavy desk fell on his back. (Tr. 218, 463.) In August 2002, he stated that he had been wearing a back brace since 1996 due to a herniated disc. (Tr. 218.) In 2003, he reported continuing back pain with some numbness in his right buttock and leg, and thus he was ordered and fitted with a new back brace. (Tr. 274-75, 386.) From 2004 to 2006, Plaintiff underwent magnetic resonance imaging ("MRI") tests, which revealed disc injury in his lumbar spine and he was ordered lumbar steroid injections on multiple occasions. (Tr. 297-98, 300, 379.) In March 2007, Plaintiff finally underwent lumbar steroid injections which provided moderate relief to his chronic pain. (Tr. 294.)

In 1993, during his incarceration at the TDCJ, Plaintiff underwent three separate carpal tunnel syndrome ("CTS") release surgeries at the John Cedar Hospital in Galveston, Texas. (Tr. 45, 50, 464.) At his consultative examination with Dr. Louis in October of 2007, Plaintiff complained of numbness and tingling in his hands and feet, but the doctor noted that he had good hand grip. (Tr. 464.)

On September 10, 2007, after Plaintiff's release from the TDCJ, he reported to Parkland Health and Hospital System ("Parkland"). (Tr. 427-31.) He complained of back pain due to his herniated disc, pain when walking with a walker, and tenderness in his lumbar spine. (Tr. 427.) The

---

[4] The Court notes that the record is replete with evidence of Plaintiff's health issues prior to his application date of August 13, 2007. While the Court has reviewed these records, and will discuss the pertinent medical evidence, the Court also points out that the earliest that SSI benefits can be paid is the month following the month the application was filed, and the claimant cannot be paid for any prior months even if the claimant met the requirements for SSI benefits earlier. *See* 20 C.F.R. § 416.335. Thus, the relevant medical evidence begins in 2007.

doctor noted that no neurological deficits could be demonstrated. (Tr. 427.) Plaintiff advised the doctor of his diagnosis of HIV in 1984 and he also reported having diabetes mellitus for the past seven years. (Tr. 427.)

Plaintiff went to the Outpatient Department Aids Clinic at the Dallas County Hospital District on August 9, 2007. (Tr. 433.) He reported his HIV diagnosis of 1984, but stated he didn't begin anti-viral therapy until he was incarcerated in 1991. (Tr. 433.) Plaintiff reported a history of drug abuse, with his drug of choice being "coke". (Tr. 433.) He stated he last used "coke" in 1987. (Tr. 433.) Plaintiff denied mental health history or thoughts of suicide. (Tr. 433.) Plaintiff's viral therapy for HIV has continued at Parkland since his release from incarceration, and it appears that his HIV is well-controlled. (Tr. 426-46, 508, 511, 521, 526, 528.)

At the request of the Commissioner, on October 9, 2007, Plaintiff underwent a consultative examination with Dr. Peter Louis. (Tr. 463-67.) On the date of the exam, Plaintiff complained of sharp back pain of a six on a scale to ten and he reported still experiencing daily back pain of a seven on a scale to ten. (Tr. 463.) He reported the pain is made worse by prolonged standing or walking and he obtains relief by medication and lying down. (Tr. 463.) The doctor noted that Plaintiff ambulated with a cane, but it was mainly for balance. (Tr. 463.) A lumbar X-Ray did not indicate any vertebra fractures, however, the exam revealed "decreased vibratory sensation, pinprick, and light touch of the lower extremities." (Tr. 463, 465.)

Plaintiff advised the doctor that he has been taking insulin to regulate his diabetes mellitus since 1994. (Tr. 463-64.) Plaintiff also reported a history of Hepatitis C, which was first observed in 1990, and high blood pressure, which was first observed about twenty years ago. (Tr. 463.) An exam of Plaintiff's chest revealed the heart size to be normal and no failure pattern was seen. (Tr. 468.)

Plaintiff conceded to a history of intravenous substance abuse, but stated he stopped using drugs in 1985. (Tr. 464.) A physical examination of Plaintiff revealed a well-developed, well-nourished muscular male with appropriate mood and affect. (Tr. 464.) The doctor recorded his impression as: (1) history of AIDS, stable; (2) Diabetes mellitus, type II, insulin dependent; (3) probable distal peripheral neuropathy; (4) hypertension, stage I, heart failure, stage B; (5) history of Hepatitis C; and (6) history of lower back pain without radiculopathy. (Tr. 465.) The doctor opined that Plaintiff "should have moderate ability to walk at least four to six hours intermittently in an eight-hour work period. Sit six to eight hours intermittently. Lift/handle lightweight and medium weight objects frequently with minimal difficulty. Speech and hearing are not impaired." (Tr. 465.)

On November 7, 2007, Plaintiff was treated at the Parkland Diabetes Clinic for blurred vision. (Tr. 417-19.) He was diagnosed with diabetic neuropathy. (Tr. 418-19.) It was noted that his glycemic control was good, he eats mostly baked foods, and he exercises three times a week by walking and doing push-ups. (Tr. 418-19.) Plaintiff was advised to continue taking his current medications, exercising, and controlling his diet. (Tr. 419.) His hypertension was noted as uncontrolled. (Tr. 419.)

In November of 2007, Plaintiff reported to the Amelia Clinic in the Dallas County Hospital District and saw Dr. Noss. (Tr. 508.) Dr. Noss diagnosed Plaintiff with Major Depressive Disorder, recurrent, with symptoms of sadness, poor sleep, hopelessness, worthlessness, irritability, low appetite, low energy, anhedonia, fatigue, and loneliness. (Tr. 508.) The doctor also noted that Plaintiff had "a little depression problem" and he had no suicide attempts or psychiatric hospitalizations. (Tr. 508.) Plaintiff was prescribed Wellbutrin SR and Celexa to control his depression. (Tr. 508.) On May 20, 2008, Plaintiff returned to the Amelia Clinic and was treated by Dr. Noss. (Tr. 531.) Plaintiff reported being off his medications for the past two months because he was in jail. (Tr. 531.)  He

6

complained of mood swings, loss of appetite, and a lack of sleep. (Tr. 531.) Plaintiff was diagnosed with Major Depressive Disorder, recurrent and severe. (Tr. 531.) He was assigned a GAF score of 50.[5]

On February 3, 2009, Plaintiff was again treated by Dr. Noss at the Amelia Clinic because he was feeling depressed. (Tr. 518.) Plaintiff reported mood swings, irritability, and anhedonia. (Tr. 518.) Plaintiff was diagnosed with Major Depressive Disorder, moderate and recurrent. (Tr. 518.) Plaintiff was assigned a GAF score of 60.[6]

At the request of the Commissioner, a consultative examination was done by Dr. Deborah Gleaves on December 21, 2007. (Tr. 470-75.) Dr. Gleaves noted that Plaintiff presented to the examination as a large individual, muscular and well-developed, but slightly overweight. (Tr. 470.) She noted that his grooming was adequate, his posture and gate were within normal limits, he had good eye contact, clear and coherent speech, no involuntary movements, and he was cooperative and polite. (Tr. 470.) Plaintiff reported being prescribed depression medication from Dr. Noss since September of 2007. (Tr. 471.) Plaintiff stated that he is taking Wellbutrin, Lexapro, and Trazodone and the medication has been somewhat helpful in that he sleeps better, is less depressed and less irritable. (Tr. 471.) Dr. Gleaves noted that Plaintiff has a long history of substance abuse, as he began using cocaine and heroine at the age of sixteen, and eventually progressed to an everyday IV drug user. (Tr. 471.) Plaintiff reported that he has not used drugs since 1985. (Tr. 471.)

---

[5] A GAF score represents a clinician's judgment of an individual's overall level of functioning. *See* AMERICAN PSYCHIATRIC ASS'N, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 34 (4th ed. text rev. 2000) (DSM). A GAF score of 41-50 indicates serious symptoms or serious impairment in social, occupational, or school functioning.  *See id.*

[6] A GAF score of 51-60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *See* AMERICAN PSYCHIATRIC ASS'N, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 34 (4th ed. text rev. 2000) (DSM).

Plaintiff complained that he feels depressed most of the day, every day. (Tr. 471.) He describes his depression as feeling sad, angry, guilty, and hopeless. (Tr. 471.) Regarding his daily activities, Plaintiff reported that he is independent with his basic activities, as he is able to make a sandwich, use a microwave oven, use a telephone, tell time, count money, and look up phone numbers in a phonebook. (Tr. 471.) He stated that he is unable to grocery shop and do household chores because of his back and leg problems. (Tr. 471-72.) He reported attending church a couple times a month. (Tr. 472.) Dr. Gleaves noted that Plaintiff's thought processes were coherent and logical, he had no loose associations or flight of ideas, he reported some paranoid ideation and ongoing passive suicidal ideation, and his mood was depressed and he had appropriate affect. (Tr. 472-73.) The doctor diagnosed Plaintiff with Major Depressive Disorder, recurrent, severe without psychotic features; cocaine abuse, in sustained full remission; and opioid abuse, in sustained full remission. (Tr. 473-74.) She assigned Plaintiff a GAF score of 50. (Tr. 474.) The doctor's prognosis was fair with appropriate treatment. (Tr. 474.) She noted that without treatment his condition will worsen, and that his prior history of substance abuse was a complicating factor. (Tr. 474.) Dr. Gleaves also noted that Plaintiff understands the meaning of filing for disability benefits and he is capable of managing his own funds. (Tr. 474.)

On May 7, 2008, Plaintiff reported to Parkland for a follow-up visit. (Tr. 532-33.) It was noted that his type II diabetes was well controlled and his medication for hypertension was increased. (Tr. 533.) It was also noted that Plaintiff "remains quite active, plays basketball several times per week". (Tr. 533.)

In 2008, the records indicate that Plaintiff began seeing Nurse Practitioner, Mary Monastesse ("Monastesse"), Plaintiff's primary treating source, at Parkland. She prescribed Plaintiff a new cane

in November of 2008 because the one he had was missing. (Tr. 522.) In June of 2009, Monastesse

ordered MRI's of Plaintiff's left knee and lumbar spine. (Tr. 846.) Plaintiff was diagnosed with pain

in his joint, in his lower leg, and chronic lower back pain. (Tr. 846.) The impression on his left knee

revealed a complex tear at the medial meniscal body and a tiny horizontal tear on the lateral meniscal

body, a small Baker's cyst, and a grade 1 MCL sprain. (Tr. 847.) Another MRI was performed on

Plaintiff's lower back in September of 2009. (Tr. 1061.) The results revealed degenerative disc

disease at L4-L5 and L5-S1 and mild right neuroforaminal stenosis at these levels, and a partially

lumbarized S1. (Tr. 1061.)

On September 9, 2009, Plaintiff went to visit an orthopedist, Dr. Finnegan, regarding his knee

problem. (Tr. 887.) Plaintiff complained of pain in his left knee with the pain being a seven out of

ten, but the doctor noted that he was still smiling. (Tr. 887.) Dr. Finnegan indicated that his knee does

not lock, pop, or give out. (Tr. 887.) She also made notations that Plaintiff was in no acute distress,

he walked with a normal-appearing gait, had normal alignment, and he walked without the use of an

assistive device. (Tr. 887.) The doctor further noted that Plaintiff's skin was intact; there was no

swelling, redness, or bruising; he had tenderness at the bilateral joint line; he had full range of motion

in both knees; and he had pain with hyperflexion. (Tr. 887.) She indicated that an MRI revealed a

medial meniscus tear grade 1 and a medial collateral ligament sprain. (Tr. 887.) Dr. Finnegan noted

that an X-Ray showed mild degenerative changes. (Tr. 887.) She assessed Plaintiff with chronic

internal derangement of his left knee, and advised that he continue taking Tramadol and attend

physical therapy. (Tr. 887.)

On January 27, 2010, Plaintiff presented to Dr. Finnegan for a follow-up visit. (Tr. 933.)

Plaintiff reported that the pain in his knee is unchanged and that he attended one physical therapy

visit. (Tr. 933.) He said that the pain is worse after sitting for a while and that he does walk around his neighborhood block about once or twice a week. (Tr. 933.) The doctor made similar notations as she did in September of 2009, but this time she noted that Plaintiff had a normal-appearing gait but he used the assistance of a cane. (Tr. 933.)

On May 27, 2008, Monastesse examined Plaintiff for his abilities to perform work-related activities. (Tr. 499-501.) The assessment found Plaintiff's lifting and carrying to be in the light exertional range, as he could lift 20 pounds occasionally and 10 pounds frequently, but he was limited to about two hours of standing and walking, and about three hours sitting in an eight-hour workday. (Tr. 499.)[7] Additionally, Monastesse found that Plaintiff would be required to shift at will from standing, sitting, and walking at 30-minute intervals. (Tr. 499-500.) Postural limitations included no climbing ladders, crawling, or balancing, and only occasional crouching and kneeling. (Tr. 500.) There were no limitations on Plaintiff's ability to climb stairs, stoop (bend), or twist. (Tr. 500.) Further, there were no restrictions on Plaintiff's ability to reach, handle (gross manipulation), finger (fine manipulation), and feeling, but he was restricted to pushing or pulling only a very light load. (Tr. 500.) Monastesse noted that the medical findings which support these limitations include Plaintiff's HIV, diabetes, hepatitis C, and peripheral neuropathy. (Tr. 501.) She also marked that Plaintiff is unable to feel the bottoms of his feet. (Tr. 501.)

---

[7] The Court notes that under the section titled "Lifting and Carrying", Monastesse handwrote that Plaintiff "states unable to lift > 20 lbs". (Tr. 499.) Additionally, the Court notes that while Monastesse circled two hours as Plaintiff's maximum ability to stand and walk, and three hours as Plaintiff's maximum ability to sit, she also initially circled "No" to the questions of whether Plaintiff's ability to stand and walk, and Plaintiff's ability to sit were impaired. (Tr. 499.)

On December 16, 2010, Monastesse completed another assessment of Plaintiff's ability to perform work-related activities. (Tr. 790-792.) This assessment found that Plaintiff could lift 20 pounds occasionally and 10 pounds frequently; was limited to less than two hours of standing and walking in an eight-hour workday because of left knee impairment and peripheral neuropathy; was limited to sitting for less than two hours in an eight-hour day; and could only sit for 20-30 minutes because of increasing pain in his lower back and then must shift to walking. (Tr. 790.) Additionally, Monastesse found that Plaintiff must shift from standing to another position after 10 minutes and must be able to shift from sitting to walking/standing whenever necessary. (Tr. 791.)

Further, she found Plaintiff could occasionally stoop and balance, but could never crouch, climb stairs, climb ladders, kneel or crawl. (Tr. 791.) Monastesse found Plaintiff not to be restricted regarding his reaching and handling (gross manipulation), but he was restricted in his fingering (fine manipulation) because of his three prior CTS surgeries. (Tr. 791.) Monastesse noted that Plaintiff's limitations were caused by numerous combined impairments including HIV, uncontrolled high blood pressure, peripheral neuropathy, knee pain, Hepatitis C, depression, high cholesterol, degenerative joint disease of his lumbar spine, and elevated serum creatinine. (Tr. 792.) In Monastesse's opinion, Plaintiff's combined impairments would cause him to be absent from work about three days per month. (Tr. 792.)

**Plaintiff's Testimony at the Hearing**

Plaintiff, represented by counsel, testified on his own behalf at the hearing held on December 16, 2010. (Tr. 592-635.) He testified to being fifty-six years old with a date of birth of July 27, 1954. (Tr. 596.) Plaintiff stated that he was over fifty years old when he applied for disability benefits. (Tr. 596-97.) Plaintiff said he completed the twelfth grade and received an

11

associate's degree in 1999. (Tr. 598.) However, he stated that he has never used that degree. (Tr. 598.) He was incarcerated for twenty years and released from incarceration on August 3, 2007. (Tr. 598-99.) Plaintiff testified that his back pain has gotten worse since the last hearing on February 19, 2009. (Tr. 600.) Plaintiff stated that he has trouble bending at the waist, he cannot tie his own shoes, and he cannot crouch. (Tr. 600.) Plaintiff testified to taking pain pills to relieve his back pain, and he also said that walking around a bit helps with the pain. (Tr. 600.)

Plaintiff testified that he takes insulin for his diabetes. (Tr. 601.) He said that the insulin keeps his symptoms under control and his daily sugars under control as well. (Tr. 601.) Plaintiff stated that he has diabetic neuropathy and that it affects him on the bottom of his feet and down his knees. (Tr. 601.) He said that the neuropathy is constant and it's painful and tingly when he walks. (Tr. 601.) Plaintiff also testified that he has trouble with CTS in that he has numbness in his hands still. (Tr. 601-02.) Plaintiff stated that while he was incarcerated his use of hands was restricted due to CTS. (Tr. 602.) Plaintiff testified regarding his knee pain and stated that the pain is in his left knee and he is currently getting injections in it. (Tr. 602.) Plaintiff said that his left knee is very weak, it swells, and it hurts when he walks on it. (Tr. 602-03.) Plaintiff said that doctors have told him he only has minimal arthritis in his knee, and thus, they want to continue with the injections instead of knee surgery. (Tr. 603.)

Plaintiff also discussed his HIV and told the ALJ that it is under control with the medication that he is taking. (Tr. 604.) Plaintiff said that the only side effect he has from his HIV or the medication is diarrhea. (Tr. 604-05.) Plaintiff testified that he is still being treated for his depression, and that he has also recently been diagnosed with Bipolar Disorder 2 by Dr. Noss. (Tr. 605, 614.) Plaintiff said that his treatment consists of visits with his psychiatrist, Dr. Noss,

every ninety days and medication. (Tr. 605.) Regarding his Bipolar Disorder, Plaintiff stated that

his concentration has been interrupted and he's forgetful and irritable. (Tr. 605.) Plaintiff said that

he only has two good friends but he sees them on a regular basis and sometimes they watch

football together on the weekends. (Tr. 605-06.) Regarding his Hepatitis C, Plaintiff stated that

his doctor is currently working on a treatment plan for him because he is just starting to have

some trouble with his kidneys. (Tr. 606.)

Plaintiff stated that he takes medication, Doxepin, to help him sleep at night. (Tr. 606.) He

said that the medication works, and he sleeps about seven hours a night. (Tr. 606.) He testified

that he lives in a house with his niece, her husband, and their two kids. (Tr. 606-07.) Regarding

his daily activities, Plaintiff testified that he can cook basic meals, he can do a little cleaning like

vacuuming and dusting, he does his own laundry, he goes grocery shopping every now and then,

he cannot mow the lawn, and he drives occasionally. (Tr. 607.) Plaintiff stated that most days he

just reads or stays at home. (Tr. 607.)

Regarding his limitations, Plaintiff testified that he didn't think he could sit longer than

thirty minutes, at which time he would need to stand up or recline back in the chair. (Tr. 608.)

Plaintiff said that reclining back in a chair is his most comfortable position for relief from all of

his pains. (Tr. 608.) He said he spends about four to five hours a day reclining in a chair. (Tr.

608.) He said that after he sits for about thirty minutes, then he needs to stand up and walk around

for about ten minutes. (Tr. 608-09.) Plaintiff testified that he could stand and walk less than a

couple of hours at one time before he would need to sit down. (Tr. 609-10.) Plaintiff stated that he

was prescribed a cane during his incarceration and requires it to stand and walk. (Tr. 610.) He

also testified that he was prescribed a cane by Monastesse, who is his primary care provider. (Tr.

610-11.) Plaintiff said that he has not had any nerve conduction testing done on his legs or feet for his neuropathy. (Tr. 611.) Plaintiff testified that he does not engage in physical therapy for his lower back pain and has not had surgery, but he does take pain medication. (Tr. 612.) He said that he does not wear a knee brace because he has not been prescribed one and the brace he tried to use in 2004 was too tight on his leg. (Tr. 612-13.)

Regarding his medications, Plaintiff testified that he takes Wellbutrin and Abilify for his depression and Bipolar Disorder. (Tr. 615.) His pain medications include Tramadol, Lyrica, and Doxepin. (Tr. 615.) He stated that he takes all of these medications on a daily basis. (Tr. 615.) Plaintiff testified that while he was incarcerated he was limited to no repetitive use of his hands, no walks for 180 yards, no walking on wet and uneven surfaces, no walking without use of his cane, no lifting of forty pounds, and no bending at the waist. (Tr. 617.) The ALJ asked Plaintiff's counsel if the prison records discussed why Plaintiff was given the limitations he testified to having or if the doctor had made some sort of specific findings. (Tr. 617-18.) Counsel responded that there were no specific findings but the restrictions were referenced throughout the prison records. (Tr. 618-19.) The ALJ also stated that the prison records continuously recommend for Plaintiff to get daily aerobic exercise. (Tr. 618.)

**The Hearing**

A VE, Dr. Thomas Irons, also testified at the hearing regarding jobs in the national economy. He stated that Plaintiff has no past relevant work experience that qualifies as substantial gainful activity. (Tr. 621.) The ALJ posed a hypothetical to the VE: assume someone who can occasionally lift and carry twenty pounds; frequently lift and carry ten pounds; stand and walk for six hours in an eight-hour workday; sit for six hours in an eight-hour workday with the option to change position or

take a stand and stretch break for two minutes every thirty minutes; occasionally climb ramps or stairs; cannot climb ladders, ropes or scaffolds; cannot balance, crawl or kneel; occasionally stoop or crouch; cannot handle food or work in proximity to hazards; retain the ability to have occasional contact with co-workers, supervisors, and the public; and retain the ability to understand, remember, and carry out detailed but not complex instructions. (Tr. 621.) He then asked the VE if that hypothetical person, with the same age, education, and experience as Plaintiff, would be able to perform any jobs in the national economy. (Tr. 621.) The VE identified the following representative occupations: "marker, light, unskilled, SVP: 2" DOT[8] #209.587-034; "photocopy machine operator, light, unskilled, SVP: 2" DOT #207.685-014; and "parking lot attendant, light, unskilled, SVP: 2" DOT #915.473-010. (Tr. 621-22.) The ALJ then asked the VE if any of those three jobs would be eliminated if the hypothetical person was limited to incidental contact with the public. (Tr. 622.) The VE responded that the parking lot attendant position would be eliminated, but would be replaced with a "folding machine operator, light, unskilled, SVP:2" DOT #208.685-014. (Tr. 622.)

Upon cross-examination, Plaintiff's counsel asked the VE to add the limitation that the hypothetical person had to use a cane for ambulation and could not lift or carry with that hand during standing and walking. (Tr. 623.) The VE responded that the position of marker would be eliminated, but that the hypothetical person would still be able to perform the other two positions of photocopy machine operator and parking lot attendant. (Tr. 623.) The VE added that his response was based on his thirty-six years' experience in vocational rehabilitation because the DOT does not address the use of a cane for ambulation in any of its job descriptions. (Tr. 624.) Plaintiff's counsel additionally asked

_____

[8] The Dictionary of Occupational Titles ("DOT") is a standardized volume of job definitions that the Social Security Administration relies on at steps 4 and 5 of its five-step disability determination process. SSR 00-4p, 2000 WL 1898704 at *2.

the VE to add in the postural restrictions of less than occasional stooping, crouching, balancing and climbing, and whether any occupations would remain that the hypothetical person could perform. (Tr. 626-27.) The VE responded that there would be remaining jobs that the person could perform. (Tr. 628-29.) The VE testified that his testimony did not conflict with the provisions in the DOT. (Tr. 633-34.)

**The Decision**

The ALJ analyzed Plaintiff's claim pursuant to the familiar five-step sequential evaluation process.[9] At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since his alleged onset date of December 1, 1997. (Tr. 567.) At step two, the ALJ found that the medical evidence established that Plaintiff had the following severe impairments: diabetes mellitus, asymptomatic HIV, depression, disorder of back, obesity, and degenerative joint disease of his left knee. (Tr. 567.) At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 568.)

Before proceeding to step four, the ALJ assessed Plaintiff's RFC. He determined that he could occasionally lift and carry twenty pounds; frequently lift and carry ten pounds; push or pull to those weights given; stand and walk for six hours in an eight-hour workday and sit for six hours in an eight-hour workday with the option to change position or take a stand and stretch break for two minutes every thirty minutes; occasionally stoop, crouch, or climb ramps and stairs; cannot balance, crawl,

---

[9] (1) Is the claimant currently working? (2) Does he have a severe impairment? (3) Does the impairment meet or equal an impairment listed in Appendix 1? (4) Does the impairment prevent him from performing his past relevant work? (5) Does the impairment prevent him from doing any other work?  20 C.F.R. §§ 404.1520, 416.920.

kneel, or climb ladders, ropes, and scaffolds; cannot handle food or work in proximity to hazards; retains the ability to have occasional contact with co-workers, supervisors, and the public; and retains the ability to understand, remember, and carry out detailed but not complex instructions. (Tr. 568-69.)

At step four, the ALJ determined that Plaintiff did not have any past relevant work. (Tr. 574.) At step five, the ALJ found, based on the testimony of the VE, that prior to September 27, 2009, there were jobs that existed in significant numbers in the national economy that Plaintiff could perform. (Tr. 574.) The ALJ also found that beginning on September 27, 2009, the date that Plaintiff's age category changed, there were no jobs that existed in significant numbers in the national economy that Plaintiff could perform. (Tr. 575.) Hence, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act prior to September 27, 2009, but he became disabled on that date and has continued to be disabled through the date of the decision. (Tr. 575.)

## **Standard of Review**

To be entitled to social security benefits, a plaintiff must prove that he is disabled for purposes of the Social Security Act. *Leggett v. Chater*, 67 F.3d 558, 563–64 (5th Cir. 1995); *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled.  Those steps are:

    1.    An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

17

2.      An individual who does not have a "severe impairment" will not be found to be disabled.

3.      An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.      If an individual is capable of performing the work the individual has done in the past, a finding of "not disabled" must be made.

5.      If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)). Under the first four steps of the inquiry, the burden lies with the claimant to prove his disability. *Leggett*, 67 F.3d at 564. The inquiry terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id*. Once the claimant satisfies his burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

The Commissioner's determination is afforded great deference. *Leggett*, 67 F.3d at 564. Judicial review of the Commissioner's findings is limited to whether the decision to deny benefits is supported by substantial evidence and to whether the proper legal standard was utilized. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C.A. § 405(g). Substantial evidence is defined as "that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance." *Leggett*, 67 F.3d at 564. The reviewing court does not reweigh the evidence, retry the issues, or substitute its own

judgment, but rather scrutinizes the record to determine whether substantial evidence is present.

*Greenspan*, 38 F.3d at 236. However, "[t]he ALJ's decision must stand or fall with the reasons set

forth in the ALJ's decision, as adopted by the Appeals Council." *Newton v. Apfel*, 209 F.3d 448, 455

(5th Cir. 2000).

## Issues

1.  Whether the ALJ erred in failing to find Plaintiff's peripheral neuropathy and
    hypertension severe under *Stone*.

2.  Whether the ALJ's finding that Plaintiff maintained a restricted light
    RFC was based on substantial evidence.

3.  Whether the ALJ committed reversible error by rejecting the medical
    source statements from Monastesse and Dr. Wilson.

4.  Whether the ALJ's rejection of Plaintiff's assessed GAF score was
    based on substantial evidence.

## Analysis

### Whether the ALJ erred in failing to find Plaintiff's peripheral neuropathy and hypertension severe under *Stone*

Plaintiff first argues that the ALJ should have found Plaintiff's peripheral neuropathy and

hypertension to be severe impairments. It appears that Plaintiff contends that the ALJ applied the

wrong standard of severity and that, therefore, remand is required.

The Regulations define a severe impairment as that which significantly limits a claimant's

physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). However, the Fifth

Circuit found that a literal application of that definition is inconsistent with the statutory language

and legislative history of the Act. *Stone v. Heckler*, 752 F.2d 1099, 1104-05 (5th Cir. 1985). In *Stone*,

the Fifth Circuit determined that an impairment is not severe only if it is a slight abnormality having

such minimal effect on the individual that it would not be expected to interfere with the individual's

ability to work. *Id.* *Stone* provides no allowance for a minimal interference on a claimant's ability to work. *Scroggins v. Astrue*, 598 F. Supp. 2d 800, 805 (N.D. Tex. 2009); *Sanders v. Astrue*, No. 3:07-CV-1827-G, 2008 WL 4211146, *7 (N.D. Tex. Sept. 12, 2008). The court must assume that the ALJ and Appeals Council have applied an incorrect standard at Step Two of the sequential evaluation process unless the correct standard is set forth by reference to *Stone* or another opinion of the same effect, or by an express statement that the ALJ or Appeals Council is using the construction the Fifth Circuit has imposed for what constitutes a severe impairment. *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000); *Stone*, 752 F.2d at 1106. Notwithstanding this presumption, the Court must look beyond the use of "magic words" and determine whether the ALJ applied the correct severity standard. *Hampton v. Bowen*, 785 F.2d 1308, 1311 (5th Cir.1986). Unless the correct standard of severity is used, the claim must be remanded to the Commissioner for reconsideration. *Stone*, 752 F.2d at 1106.

Here, the ALJ cited to *Stone* in the "Applicable Law" section of the decision, as well as in the "Findings of Fact and Conclusions of Law" portion of the decision. (Tr. 566-68.) The ALJ specifically wrote "[a]ll impairments have been considered under the standard set forth in <u>Stone v. Heckler</u>, 752 F.2d 1099 (5th Cir. 1985)." (Tr. 567.) Then the ALJ continued by stating that Plaintiff had been diagnosed with neuropathy and hypertension, but there was no evidence of ongoing treatment for these impairments. (Tr. 568.) He then stated that regarding the neuropathy, the medical records did not show how Plaintiff was assessed with neuropathy, as there were no tests conducted to confirm the Plaintiff's neuropathy. (Tr. 568.) He then stated that when considered alone or in combination with Plaintiff's other impairments, Plaintiff's diagnosed neuropathy and hypertension can be considered "not severe because they are a slight abnormality having such minimal effect on the claimant that they would not be expected to interfere with the claimant's ability to work,

irrespective of age, education or work experience. <u>Stone v. Heckler</u>, 752 F.2d 1099, 1101 (5th Cir. 1985)." (Tr. 568.) Clearly the ALJ used the correct severity standard, and there is no indication that he failed to apply it to the facts of Plaintiff's case.

To support his argument that his peripheral neuropathy is severe, Plaintiff references one record from a licensed physician, Dr. Gumbo, where he was diagnosed with diabetic neuropathy. (*See* Pl.'s Br. at 19; Tr. 418-19.) However, the diagnosis of an impairment does not establish a disabling impairment or even a significant impact on that person's functional capacity. *See Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983) (noting that the mere presence of some impairment is not disabling per se). Furthermore, in that same record from Parkland, the doctor also noted that Plaintiff's glycemic control was good and that he exercises three times a week by walking and doing push-ups. (Tr. 418-19.) The doctor advised Plaintiff to continue his current medications, exercise, and control his diet. (Tr. 419.) Additionally, on September 10, 2007, Dr. Gumbo saw Plaintiff again and noted that no neurological deficits could be demonstrated and there was no musculoskeletal abnormality. (Tr. 427.)

The remaining medical records that Plaintiff uses to support his argument originate from a registered nurse or nurse practitioner, Monastesse. (Pl. Br. at 19.) Monastesse is not a licensed physician and is not an "acceptable medical source" and thus she cannot be considered a "treating source" whose opinions are entitled to controlling weight. *See* 20 C.F.R. § 416.913(a); 20 C.F.R. § 416.902; 20 C.F.R. § 416.927. Moreover, the terms of 20 C.F.R. § 404.1527 define "medical opinions" and instruct claimants on how the Commissioner will consider the opinions.[10] In the Fifth

---

[10]   The terms of 20 C.F.R. § 404.1527(a)(2) provide:

(2) Evidence that you submit or that we obtain may contain medical opinions. Medical

Circuit, "the opinion of the treating physician who is familiar with the claimant's impairments, treatments and responses, should be accorded great weight in determining disability." *Newton*, 209 F.3d 448, 455 (5th Cir. 2000); *see Floyd v. Bowen,* 833 F.2d 529, 531 (5th Cir.1987). Here, Monastesse is not a treating physician and her opinions can neither be considered "medical opinions" nor can they establish the existence of a medically determinable impairment. SSR 06-03p. Under the Social Security Regulations ("Regulations"), Monastesse is considered an "other source" and her opinions or findings can be used by the Commissioner to show the severity of a claimant's impairment and how it affects his ability to work. 20 C.F.R. § 416.913(d).

On May 20, 2008, Parkland records noted that Plaintiff's neuropathy was bad and he wasn't walking. (Tr. 531.) However, less than two weeks prior to that visit, Parkland records reflected that Plaintiff "remains quite active, plays basketball several times per week." (Tr. 533.) In October 2008, Monastesse noted that Plaintiff had worsening pain in his feet. (Tr. 525.) However, she also failed to mention that Plaintiff had any neurological numbness or sensation, and instead she noted that he had normal gait and posture and full range of motion in his bilateral lower extremities. (Tr. 525.) Again, in August 2008, Monastesse noted normal gait and posture and full range of motion in Plaintiff's bilateral lower extremities. (Tr. 527.) She also noted that Plaintiff had no neurological numbness. (Tr. 527.) In December 2008, Monastesse made the notation that Plaintiff had numbness in his feet. (Tr. 520.) Nonetheless, she also again noted that he had normal gait and posture and full

---

opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions.

range of motion in his bilateral lower extremities. (Tr. 520.) Substantial evidence supports the ALJ's finding that Plaintiff's peripheral neuropathy was not severe.

In support of his argument that his hypertension is severe, Plaintiff points to medical evidence in the record which denotes, at times, that Plaintiff's hypertension was uncontrolled. (Pl.'s Br. at 19.) However, Plaintiff fails to point to any medical records which demonstrate how his uncontrolled hypertension limits his ability to work. Furthermore, Plaintiff did not allege any limitations from his hypertension either at the hearing or in his brief. In fact, Plaintiff did not even mention his hypertension in his reply brief. The Court finds that the ALJ accurately assessed Plaintiff's hypertension as non-severe.[11]

Finally, Plaintiff claims that the ALJ did not even consider Plaintiff's CTS in his decision, much less classify the impairment as severe or non-severe. The ALJ's duty to investigate does not extend to possible disabilities that are not alleged by the claimant and not clearly indicated in the record. *See Leggett*, 67 F.3d at 566. Plaintiff did not allege CTS to be the basis of his claim on his application for disability, in his request for reconsideration, or at the hearings. Although Plaintiff testified that he underwent three CTS release surgeries in 1993 while incarcerated, he never testified to seeking any medical treatment for CTS since those surgeries. At the second hearing, Plaintiff did testify that he still has some numbness in his hands, but there are no medical records indicating that Plaintiff was being treated for CTS. Subjective complaints must be corroborated by objective medical evidence. *See Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001).

_____

[11] The Court notes that at the examination with Dr. Louis, Plaintiff's blood pressure was 125/80 and a chest exam revealed Plaintiff's heart size to be normal and no infiltrate or failure pattern was seen. (Tr. 464, 468.)

Furthermore, although Plaintiff did report to Dr. Louis that he had some numbness and tingling in his hands, there is no medical evidence to support the contention that his CTS was severe or disabling. The mere mention of a condition or a diagnosis in the medical records does not establish a disabling impairment or even a significant impact on that person's functional capacity. *See Hames*, 707 F.2d at 165. His medical records only show three CTS release surgeries occurring approximately four years before his alleged onset date. The Court finds that Plaintiff did not allege any limitation resulting from his CTS and such limitations were not apparent from the record.[12] Therefore, the ALJ was not required to consider the condition. *See Leggett*, 67 F.3d at 566.

In sum, the Court finds that the ALJ's step two determination did not contain reversible error requiring remand, and instead was supported by substantial evidence.

**Whether the ALJ's finding that Plaintiff maintained a restricted light RFC was based on substantial evidence**

Plaintiff also alleges that substantial evidence does not support the RFC formulated by the ALJ. Substantial evidence is defined as "that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance." *Leggett*, 67 F.3d at 564. The ALJ determined that based on Plaintiff's age, education, work experience, medical conditions, and limitations, he retained the RFC to perform a limited range of light work[13] with the following additional restrictions: occasional stooping,

_____

[12] The Court notes that in the examination with Dr. Louis, where Plaintiff indicated numbness and tingling in his hands, Dr. Louis made the notation that Plaintiff had good hand grip. (Tr. 464.)

[13] Light work is defined as work that involves lifting no more than twenty pounds at a time with frequent lifting or carrying up to ten pounds. Even though the weight lifted may be very little, a job in this category requires a good deal of walking or standing, or it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable

crouching, or climbing ramps and stairs; no balancing, crawling, kneeling, or climbing ladders, ropes, and scaffolds; no handling food or working in proximity to hazards; occasional contact with co-workers, supervisors, and the public; and can understand, remember, and carry out detailed but not complex instructions. (Tr. 569.) Based on this RFC, the ALJ found that Plaintiff could perform work as a marker, photocopy machine operator, or parking lot attendant. (Tr. 574-75.)

In his brief, Plaintiff contends that the ALJ failed to properly consider Plaintiff's back impairments, peripheral neuropathy, CTS, and records from the TDCJ in assessing Plaintiff's RFC. (Pl.'s Br. at 20-25.) This Court disagrees.

Regarding Plaintiff's back impairment, the ALJ included several restrictions in the RFC solely because of Plaintiff's lower back pain. For example, the ALJ limited Plaintiff to no balancing, crawling, kneeling, or climbing ladders, ropes, and scaffolds. He further restricted Plaintiff to only occasional stooping, crouching, or climbing ramps and stairs. Additionally, the ALJ incorporated Plaintiff's need to change positions or take a stand and stretch type break for two minutes every thirty minutes out of an eight-hour workday. In his Findings, the ALJ found Plaintiff's back disorder to be a severe impairment and he noted that he gave great weight to the report of Dr. Louis when considering Plaintiff's physical limitations. (Tr. 571.)

In his consultative examination on October 9, 2007, Dr. Louis noted that previous X-Rays of Plaintiff's back were negative for fracture or dislocation, but an MRI showed a bulging disc in the lower back area. Dr. Louis indicated that Plaintiff did not receive surgery but he did receive steroid injections into his back. March 2007 records from the TDCJ showed that these injections provided

---

of performing a full range of light work, an individual must have the ability to do substantially all of these abilities. 20 C.F.R. § 416.967.

Plaintiff moderate relief. Dr. Louis noted that Plaintiff ambulated with the aid of a cane, but it was mainly for balance. Dr. Louis' physical examination revealed a well-developed, well-nourished muscular male with appropriate mood and affect. An exam of Plaintiff's lumbar spine was done and it showed disc space between L4-L5 and L5-S1, but no fracture was visualized. After his examination, Dr. Louis assessed that Plaintiff could walk at least four to six hours intermittently in an eight-hour workday and sit six to eight hours intermittently in an eight-hour workday. He also opined that Plaintiff could lift and handle lightweight and medium weight objects frequently with little difficulty, and Plaintiff's speech and hearing were not impaired.

On December 21, 2007, Plaintiff presented to Dr. Gleaves for his depression issues. At that consultation, he reported to Dr. Gleaves that he was unable to grocery shop or do household chores because of his back and leg problems. However, at the hearing on December 16, 2010, Plaintiff told the ALJ that he is able to vacuum, dust, do laundry, and occasionally grocery shop. Thus indicating that Plaintiff's back problems have gotten better over the relevant time period. On September 9, 2009, Plaintiff went to see an orthopedist regarding his knee problems. Dr. Finnegan noted that Plaintiff walked with a normal-appearing gait, had normal alignment, and was not utilizing a cane for ambulation. Plaintiff testified at the hearing that he required a cane to stand and walk.

Finally, the Court notes that the record is replete with statements from physicians describing Plaintiff as a muscular and well-developed male. (*See, e.g.,* Tr. 470.) Furthermore, the record is also filled with statements from physicians either advising Plaintiff to exercise, or noting that Plaintiff does exercise and evens plays basketball. (*See, e.g.,* Tr. 418.) The Court finds that the ALJ included Plaintiff's back impairment in his RFC assessment, and the RFC is based on substantial evidence.

Next, Plaintiff argues that the ALJ did not consider Plaintiff's peripheral neuropathy in making his RFC determination. (Pl.'s Br. at 22.) Plaintiff correctly contends that even though the ALJ did not find Plaintiff's peripheral neuropathy to be severe, he still must consider the impairment in making his RFC formulation. *See* 20 C.F.R. § 404.1545(e). Specifically, Plaintiff claims that if the ALJ had considered his peripheral neuropathy then he would not have found Plaintiff able to stand and walk for six hours in an eight-hour workday. (Tr. 22.)

In Dr. Louis' examination, which the ALJ gave great weight, the doctor found that Plaintiff had probable distal peripheral neuropathy, yet he also found that Plaintiff was able to walk at least four to six hours intermittently in an eight-hour period. In his RFC formulation, the ALJ specifically allowed for Plaintiff to have the option to change positions or take a stand and stretch type break for two minutes out of every thirty minutes, either after Plaintiff has been standing and walking or after he has been sitting. Thus, the ALJ properly incorporated Plaintiff's non-severe limitation of peripheral neuropathy in the RFC formulation.

Additionally, Plaintiff argues that the ALJ should have considered his CTS in determining his RFC. However, the only medical evidence in the record pertaining to Plaintiff's CTS are prison records from his three release surgeries back in 1993, four years before his alleged onset date of disability. Furthermore, as this Court has already pointed out, although Plaintiff testified to still having some numbness in his hands, he has not sought any medical treatment for CTS. *See Villa v Sullivan*, 895 F.2d 1019, 1024 (5th Cir. 1990) (holding that the lack of medical treatment may be considered by the ALJ in evaluating a claimant's condition). Here, there simply are no records to support Plaintiff's CTS or to demonstrate that Plaintiff was being treated for CTS. The ALJ is not required to incorporate limitations in the RFC that he did not find to be supported in the record. *See*

27

*Morris v. Bowen*, 864 F.2d 333, 336 (5th Cir.1988). Thus the ALJ properly disregarded CTS from his RFC formulation.

Finally, Plaintiff contends that the ALJ misinterpreted pages five and eight of the TDCJ records to prove that Plaintiff was without restriction while incarcerated. (Pl.'s Br. at 24-25.) The Court finds this argument lacks merit.

In his Findings, the ALJ mentioned that in the TDCJ records, the box indicating that "[t]he health benefits of daily aerobic exercise, as tolerated, discussed with the patient" was checked instead of the box indicating "[l]imited physical activity due to medical restrictions" being checked. (*See* Tr. 196, 199, 569-70.) However, the ALJ never stated that these records demonstrated that Plaintiff was *without restriction*. Instead, he said that these records showed that Plaintiff was not as limited as he alleged. (Tr. 569.) Although somewhat trivial, the Court agrees with the ALJ and finds that the person filling out the form most likely would have checked the box "limited physical activity due to medical restrictions" if Plaintiff was as limited as he alleged and thus disabled.[14] The Court is fully aware of the list of diagnoses in the TDCJ records from February of 2007, as well as the health classification or form HSM-18, which will be discussed subsequently. Notwithstanding, Plaintiff's argument fails because the ALJ did not use the TDCJ records to show that Plaintiff was without restriction. In fact, when formulating Plaintiff's RFC, the ALJ restricted Plaintiff in many different areas.

In conclusion, the Court finds that the ALJ's RFC formulation is supported by substantial evidence.

**Whether the ALJ committed reversible error by rejecting the medical source statements from Monastesse and Dr. Wilson**

---

[14] The Court notes that Plaintiff claims an alleged onset date of disability of December 1, 1997.

28

Plaintiff contends that the ALJ committed reversible error by rejecting the medical source statements from Monastesse and "Dr. Wilson" (the health classification from the TDCJ records). (Pl.'s Br. at 25.)

The mandate rule provides that a lower court on remand must implement both the letter and the spirit of the appellate court's mandate and may not disregard the explicit directives of the appellate court. *Brown v. Astrue*, 597 F. Supp. 2d 691, 695 (N.D. Tex. 2009) (citing *United States v. Becerra*, 155 F.3d 740, 752 (5th Cir. 1998)). "In Social Security proceedings, the district court's position to the Appeals Council (and indirectly, the ALJ) is analogous to that of the court of appeals' position with respect to a trial court." *Id.* at n.3 (quoting *Ischay v. Barnhart*, 383 F. Supp. 2d 1199, 1215 (C.D. Cal. 2005)). The Commissioner is not entitled to endless opportunities to apply the proper legal standard correctly and gather evidence to support his conclusion. *Friday v. Comm'r of Soc. Sec. Admin.*, No. 3:08-CV-0538-K, 2009 WL 1181068, at *6 (N.D. Tex. Apr. 29, 2009) (citing *Miller v. Chater*, 99 F.3d 972, 978 (10th Cir. 1996)).

Here, the Court finds that the ALJ obeyed the District Court's Order and thus followed the mandate rule. The original case, 3:09-CV-02018-G, was reversed and remanded because the ALJ failed to consider the health classification of the TDCJ, failed to properly weigh Dr. Monastesse's medical opinion or show good cause for rejecting that opinion, and failed to provide reasoning for according more weight to the opinion of Dr. Louis. (Findings, Conclusions and Recommendation of the United States Magistrate Judge, doc. 23, at 13-14.) The Court notes that Monastesse's title was mischaracterized in the original case, as she was considered a physician instead of a registered nurse or a nurse practitioner.

As this Court has already pointed out, since Monastesse is not a licensed physician and is not an "acceptable medical source", she cannot be considered a "treating source" whose opinions are entitled to controlling weight. *See* 20 C.F.R. § 416.913(a); 20 C.F.R. § 416.902; 20 C.F.R. § 416.927. Moreover, the terms of 20 C.F.R. § 404.1527 define "medical opinions" as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including symptoms, diagnosis and prognosis, what [a claimant] can still do despite impairment(s), and [a claimant's] physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2). Here, Monastesse is not a treating physician and her opinions can neither be considered "medical opinions" nor can they establish the existence of a medically determinable impairment. SSR 06-03p. Thus, the ALJ is not required to weigh her "medical opinion". Under the Regulations, Monastesse is considered an "other source" and her opinions or findings can be used by the Commissioner to show the severity of a claimant's impairment and how it effects his ability to work. 20 C.F.R. § 416.913(d).

Monastesse completed two medical source statements titled "Medical Opinion Re: Ability to Do Work-Related Activities" dated May 27, 2008 and December 16, 2010. (Tr. 499-501; 790-792.) The ALJ stated in his Findings that he gave little weight to both of these opinions. (Tr. 570.) He explained that both of the statements were "extreme and not supported by the medical evidence in the record". (Tr. 570.) The ALJ first explained that Monastesse was considered a physician in the earlier decision, when in reality she is a registered nurse whose opinions are not considered "medical opinions". (Tr. 570-71.) The ALJ then continued with additional reasons for why he actually rejected Monastesse's opinion. He stated that the medical evidence that pre-dates Plaintiff's disability application date shows that on numerous occasions, Plaintiff had basically normal examination

findings. (Tr. 571.) Additionally, the ALJ explained that Monastesse's own reports did not reveal significant clinical and laboratory abnormalities showing that Plaintiff was in fact disabled. (Tr. 571.) He further said that her opinions are not consistent with Plaintiff's other treatment notes in the record. (Tr. 571.) Finally, he explained that it appeared from her medical source statements that she relied heavily on Plaintiff's subjective complaints of pain and symptoms, and seemed to accept as true most, if not all, of what Plaintiff reported. (Tr. 571.) In sum, the ALJ stated that he rejected Monastesse's opinion because she is not an "acceptable medical source" entitled to give a "medical opinion" and because her opinions were not supported by or consistent with the other medical evidence in the record. (Tr. 571.)

The ALJ then stated that he accorded greater weight to the October 9, 2007 report of Dr. Louis (Tr. 463-68), and utilized that report in finding Plaintiff's physical limitations. (Tr. 571.) He explained that Dr. Louis had the opportunity to conduct a thorough consultative examination with Plaintiff, and although he was an examining physician instead of a treating physician, he relied greatly on his report because it was consistent with his own examination findings and supported by the other medical evidence in the record. (Tr. 571.)

Plaintiff supplied medical records from his incarceration at the TDCJ. Those records contained an HSM-18 form, or a health classification form. (Tr. 415.) In his Findings, the ALJ stated that he gave no weight to the health classification form dated March 28, 2006 that was provided by the TDCJ. (Tr. 571.) The ALJ provided several reasons for rejecting this form. First, he stated that there was no indication that a physician had completed the form. (Tr. 571.) Further, there was no indication of who completed the form at all, and whether that person had any type of medical background. (Tr. 571.) The only information typed on the form was the name of the person who

31

scanned the form and a doctor's name, Wilson, C. (*See* Tr.415.) There was no signature of the doctor on this form or any indication that he either completed or reviewed the form. (Tr. 415.) The ALJ also stated that whoever did complete the form, provided no explanation for why he selected the different "work assignments/restrictions". (Tr. 571.) Thus, there was no explanation provided for why Plaintiff was restricted in these certain areas. (*See* Tr. 415.) The ALJ also explained that this health classification form was completed over a year prior to the date that Plaintiff filed his application for SSI. (Tr. 571.) Finally, the ALJ explained that on May 17, 2006 and November 29, 2006, Plaintiff's treating source at the TDCJ could have checked the box indicating "limited physical activity due to medical restriction", but instead, on both occasions, he checked the box indicating "the health benefits of daily aerobic exercise, as tolerated, discussed with the patient". (*See* Tr. 196, 199, 571.) This indicates that Plaintiff did not have those physical restrictions that were alleged in the health classification form, or at least by May 17, 2006, Plaintiff no longer had such limited physical activity due to medical restrictions. (Tr. 571.)

The Court finds that the ALJ followed the mandate rule because he considered the health classification of the TDCJ and provided good cause for rejecting the form. Additionally, he showed good cause for rejecting the opinion of Monastesse and provided reasoning for why he did not weigh her "medical opinion" or give her opinion controlling weight. Finally, he provided sufficient explanation for why he accorded greater weight to the opinion of Dr. Louis. The Court also finds that the reasons provided by the ALJ for giving no weight to the medical source statements of Monastesse

and the TDCJ health classification form are well-supported. The ALJ did not commit reversible error by rejecting those forms and substantial evidence supports his decision.[15]

**Whether the ALJ's rejection of Plaintiff's assessed GAF score was based on substantial evidence**

In his final argument, Plaintiff contends the ALJ erred by failing to give weight to the GAF scores assigned by his treating and consultative physicians. The Court notes that "while a GAF score may be of considerable help to the ALJ in formulating the RFC, it is not essential to the RFC's accuracy." *Perez v. Astrue*, No. 6:07-CV-014-BI, 2008 WL 4108130, at *8 (N.D. Tex. Sept. 5, 2008) (quoting *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002)). The Commissioner has specifically declined to endorse the GAF scale for use in the disability programs and has stated that it "does not have a direct correlation to the severity requirements in our mental disorders listings." REVISED MEDICAL CRITERIA FOR EVALUATING MENTAL DISORDERS AND TRAUMATIC BRAIN INJURY, 65 Fed. Reg. 50,746, 50,764-65 (Aug. 21, 2000); *see also Cromwell v. Astrue*, No. 4:10-CV-061-Y, 2011 WL 666282, at *7 (N.D. Tex. Jan. 21, 2011). The Court finds that Plaintiff's argument lacks merit.

Essentially, Plaintiff argues that since Dr. Gleaves and Dr. Noss both assigned Plaintiff a GAF score of 50 for his depression, the ALJ should have accorded more weight to these GAF assessments.

---

[15] The Court makes two brief notations in response to Plaintiff's argument that the ALJ committed reversible error. First, while the ALJ did reject Monastesse's two medical source statements or "medical opinions", he did not reject the entirety of her records and actually did cite to some of her Parkland records in his Findings. Additionally, the Court notes that Plaintiff relentlessly argues that the TDCJ health classification form was completed by Dr. Wilson. (*See* Pl.'s Br. at 30-32; Pl.'s Reply Br. at 10.) In fact, in his reply brief, Plaintiff states that the form "was clearly signed by Doctor C. Wilson D.O. on March 28, 2006." (Pl.'s Reply Br. at 10.) This statement is just untrue. There is no signature of Dr. Wilson on the form, only his *typed* name appears at the bottom of the form, and the signature line is completely blank. (Tr. 415.)

(Pl.'s Br. at 33-34.) However, the Court points out that Plaintiff fails to mention that on February 3, 2009, Dr. Noss assigned Plaintiff a GAF score of 60. Furthermore, on May 20, 2008, when Dr. Noss did assign Plaintiff a GAF score of 50, Plaintiff had reported being off of his medications for the past few months because he had been in jail. Plaintiff also fails to mention that on Plaintiff's visit to Dr. Noss in November of 2007, the doctor recorded that Plaintiff had "a little depression problem" and he had no suicide attempts or psychiatric hospitalizations. At that visit, Plaintiff was prescribed medication for his depression, which he later quit taking because he was in jail. In his brief, Plaintiff also argues that both Dr. Gleaves and Dr. Noss diagnosed Plaintiff with severe, recurrent Major Depressive Disorder. Nonetheless, Plaintiff again fails to mention that on February 3, 2009, Dr. Noss actually diagnosed Plaintiff with Major Depressive Disorder, *moderate* and recurrent.

The Court points out that while Dr. Gleaves did assign Plaintiff a GAF score of 50, Plaintiff had only been taking his medications for a few months prior to this consultative examination. Further, at the examination on December 21, 2007, Plaintiff reported that his medications had been somewhat helpful in that he slept better, was less depressed, and was less irritable. An impairment that can be controlled or remedied by medication or therapy cannot serve as a basis for a finding of disability. *See Johnson v. Bowen,* 864 F.2d 340, 348 (5th Cir. 1988). Additionally, in her report, Dr. Gleaves noted that Plaintiff has a long history of substance abuse, that he started abusing cocaine and heroin at the age of sixteen, that he was an everyday intravenous drug user, and that his history of substance abuse was a contributing factor to his depression. She recommended that Plaintiff continue with treatment.

It is clear from the decision that the ALJ did in fact consider the GAF scores and assigned them little weight, stating that the evidence failed to show that Plaintiff's symptoms were anything

more than moderate. (Tr. 572.) A GAF score of 60 indicates moderate symptoms, and thus Dr. Noss'
assessment in February of 2009, when Plaintiff was taking his prescribed medications, is consistent
with the ALJ's findings that Plaintiff's symptoms were moderate. Additionally, as noted above, the
Commissioner has declined to endorse the GAF scale for use in the disability programs. Substantial
evidence supports the ALJ's decision to give little weight to Plaintiff's GAF scores of 50.

### Recommendation

For the foregoing reasons, this Court recommends that the District Court AFFIRM, in part,
and REVERSE, in part, the final decision of the Commissioner. Regarding the reversal, the Court
recommends that instead of finding Plaintiff disabled beginning September 27, 2009, the District
Court find Plaintiff disabled beginning July 27, 2009, because that is the date on which Plaintiff
reached the classification of "an individual of advanced age". The remainder of the ALJ's decision
should be AFFIRMED.

SO RECOMMENDED, July 30, 2012.

PAUL D. STICKNEY
UNITED STATES MAGISTRATE JUDGE

**INSTRUCTIONS FOR SERVICE AND
NOTICE OF RIGHT TO APPEAL/OBJECT**

The United States District Clerk shall serve a copy of these findings, conclusions, and recommendation on the parties.  Pursuant to Title 28, United States Code, Section 636(b)(1), any party who desires to object to these findings, conclusions, and recommendation must serve and file written objections within fourteen days after service.  A party filing objections must specifically identify those findings, conclusions, or recommendation to which objections are being made.  The District Court need not consider frivolous, conclusory, or general objections.  A party's failure to file such written objections to these proposed findings, conclusions, and recommendation shall bar that party from a *de novo* determination by the District Court.  *See Thomas v. Arn*, 474 U.S. 140, 150 (1985).  Additionally, any failure to file written objections to the proposed findings, conclusions, and recommendation within fourteen days after service shall bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted by the District Court, except upon grounds of plain error.  *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc).